Morning, Mr. Todd. Yes, good morning, your honors, and may it please the court. My name is Kevin Todd. I'm here on behalf of the plaintiff appellant, Robbie Anderson. At base, your honors, this is a case where the district court simply misconstrued the timeline of events and erroneously granted summary judgment based on that mistaken timeline. Here's the correct timeline. Throughout the fall of 2019, my client, Robbie Anderson, knew that his During that time, he had a number of optimistic cases with his supervisors about what his specific role would look like after the merger was complete. Then on November 16, 2019, Mr. Anderson had a seizure. He was rushed to the hospital, and while he was promptly able to return to work, he was given a six-month driving restriction. He reported his disability and his work restriction to his direct supervisor, Lindsey Comer, two days later on November 18. About a week after that, on November 26, Comer's boss, Kathy Hopkins, and defendant's HR office learned about Mr. Anderson's disability. Another 10 days or so pass, and we learn on December 6 that Hopkins is considering terminating Mr. Anderson's employment. She first brings up this possible termination in connection with what she calls, quote, a medical restriction. Hopkins, with the help of defendant's HR manager, Marty Nowlin, decides to go forward with the termination in part because of Mr. Anderson's accommodation. Eleven days after that, on December 17, defendant carries out the termination. The district court, on page 11 of its order, mistakenly characterized those December 6 and 7 emails as post-termination emails, even though they took place 11 days before Mr. Anderson's termination. Consequently, the district court found no causal inferences to draw from those emails. When the December 6 and 7 exchange is properly characterized as being part of defendant's decisional process, rather than a post-termination conversation, the inferences in Mr. Anderson's favor become clear, that Edisa's decision to terminate Mr. Anderson's... Oh my God. Yes, Adjournal? I'm sorry, go ahead. Oh, I'm sorry. I thought you had a question. I'm sorry. I do, actually. Assuming that you're correct that the district court misconstrued a timeline here, what is it, assuming that we accept your proposition on that, what is it in this record that would nevertheless not mean that the summary judgment was appropriate? It seems to me that the nub of this case, I think the nub of the case really revolves around a conversation on email exchange on December 6 about your client's prospects. Can you help me with why it is? I think that's really the thing that this case turns on. So tell me why you win based on this email. That's right, Judge. So if you look at those emails, which are I believe page 345 and 346 of the joint appendix, which are basically the only contemporaneous documentation we have related to the defendant's decision here, Ms. Hopkins starts out that first email identifying what at the time seems to be the only fact that she knew about Mr. Anderson, that he had a medical restriction, and therefore she was considering terminating his employment. Throughout the course of those emails, as they exchanged some information, and in the final one, Mr. Nowlin, the HR manager, identifies three reasons why he believes the termination is defendable. Among those three reasons are what he calls the unreasonable nature of the accommodation that Mr. Anderson has asked for. Now since that time, the defendant has not argued that it simply couldn't accommodate Mr. Anderson, and because his accommodation was unreasonable. Instead, the defendant has pointed to a supposed reduction in force, pointed to performance issues, things along those lines. But it seems from the conversations they were having at the time, the idea that Mr. Anderson needed this accommodation, and that was something the defendant didn't want to deal with, that they thought was going to be an issue for them, seems to have really been a core part of the decision they were to make there, after Ms. Hopkins initially states that Mr. Anderson has a medical restriction. It's only after HR, through Mr. Nowlin, tells her that that could potentially be a problem, that she comes back and talks about some performance concerns, which I think in the context of those emails, in the context of them coming up, after HR has told her that it could be a problem to terminate someone because of their disability, I think there's a reasonable inference a jury could draw that those performance concerns she raised at that point were sort of a back-filled rationalization, after she learned that the actual reason she was interested in doing this could be an issue. And then in the end, HR decides to support her decision, in part because HR thinks that the decision would be defendable, based on this accommodation that Mr. Anderson has asked for. I think that a reasonable inference that a jury could for Mr. Anderson's disability, his request for an accommodation, the idea that he was going to need this accommodation for at least several months, was a key part of the defendant's decision at that time. What about the idea, and I thought this was identified even before the seizure, that he was not a good, that he was maybe a good hunter, so to speak, but not a good farmer? So, Judge Gruner, there's no sort of contemporaneous documentation from before Mr. Anderson's seizure that says that he was a poor performer, that he was a worse performer. I believe there is some evidence in the record that I think that a couple of customers had requested not to work with him going forward. However, there's nothing to show at the time that that was a reason for the termination. In fact, before the seizure, his supervisors were having some pretty optimistic conversations with him about what his job after the merger was going to look like. They were aware that his strongest skill set, as you said, was the hunting, going out and bringing in new business. He talked with his supervisor, Lindsey Comer, about how much he was going to like his new job after the merger. A couple of supervisors, I believe it was Rob Peterson, the assistant general manager, had said that they were even looking at sort of an expanded hunter role for Mr. Anderson after the merger, so that he could really take advantage of that skill set. And that was the tone of the conversations he was having. He was aware that this general idea that a merger was going on, but as far as everyone told him, as far as he knew, as far as the conversations he was having with his supervisors, everyone seems to have been seems to have been on the same page that he was going to be a part of the company's future after that merger. And that only really seemed to change after his seizure, after he said he was going to need this accommodation. The defendant, I think, did accommodate him. I think you pointed out that Comer's attitude changed. Isn't that correct? That seems to be right, Your Honor. Yes. Prior to the seizure, Ms. Comer... I mean, that's your argument, anyway. It's that Ms. Comer's attitude changed, and particularly once Ms. Comer's supervisor, Kathy Hopkins, became aware of the situation. It seemed that on November 26th, about a week or so after Comer became aware of the situation, she told my client, Mr. Anderson, that she was going to have to... that she knew she was going to have to pass this up to her boss, to Kathy Hopkins. Mr. Anderson asked her at the time, you know, hey, is this going to be a job? Is this going to be a problem? When Ms. Comer at that time said, you know, I don't know. I sure hope not. All I know is that I have to pass it on to my superiors. And it seemed that at that point was kind of when the attitude shift occurred, when Ms. Comer passed that up to her supervisors. They seemed to think that this accommodation was going to be unreasonable for him, and that that was the time that the decision seemed to be made between about November 26th, when Ms. Hopkins found out about the issue from Comer, and, you know, these December 6th and 7th emails we look at between Hopkins and the Human Resources Office, and then December 17th, 18th or so when the termination went down. I know that... I'll note as well, Your Honors, that the district court, I believe part of the reason that it found no inferences to draw from these emails is that the district court said, you know, all of the relevant conversations about this situation, and I think this may have been what your question was touching on, Judge Grinder, that all of the relevant conversations happened prior to Mr. Anderson's seizure. We'll certainly be the first to say that, yes, there were conversations about the idea that a merger was going to be happening between Adisa and TradeRev, one of its sister companies. You know, that was certainly in the works. They knew there were going to be some shifting sales territories, things along those lines. But as far as specifically the decision to terminate Mr. Anderson's employment, everything about that that we've seen in the record appears to come later, to come after the seizure. There's kind of that dividing line of, you know, pre-seizure he was having these conversations about, you know, how much he would like his new role, about how they were envisioning him really focusing in on that hunting skill that he had been brought into the company for. You know, he was brought into work a sales region initially that, I think, due to some hires and things that hadn't worked out before his time, that at that time the company was getting very little business out of. They brought in Mr. Anderson because they knew of his skill at being good at going out and bringing in new business to really try and kind of juice that area. He was able to about allowing that to continue and even potentially an expanded role going forward until they learned that, you know, he was going to potentially need someone to drive him around because he had this six-month driving restriction following his seizure. I will note as well, Your Honors, one additional point that in the district court's opinion, and I believe they said that the presence of some of these causes unconnected, I think the district court called them on page 13 or 14 of its opinion, sort of negated any significance that might be drawn from these emails and might be drawn from the idea that Mr. Anderson, that his accommodation was any part of this. I will note that this court has held, and I believe it was the Griffith case, and the Supreme Court, you know, affirmed the same, basically the same standard in the Bostock case, that the presence of potential legitimate motives out there does not negate or does not entitle the defendant to summary judgment in a case where there's also evidence that a jury could point to to say that, you know, even if there were some of these legitimate motives kind of in the air in the decision making process, if there was also an impermissible motive, which here I think a jury would certainly be entitled to find that there was, that that is not enough to entitle the defendant to summary judgment, that that still needs to be a jury question. That's really the core of our case here, Your Honor. It's that if you draw these reasonable inferences in favor of Mr. Anderson that I think the district court simply missed due to its misconstruing of the timeline, a jury would be entitled to find that Mr. Anderson was terminated because of his accommodation and because of his disability and his request for an accommodation. And with that, I will reserve the rest of my time for rebuttal. Very well. Thank you, Mr. Todd. Mr. Hanslick? May it please the Court, Jeffrey Hanslick for the appellate. I'd like to begin by disagreeing with Mr. Todd. I do not believe the district court misconstrued the timeline. He bases that on the district court's statement that the emails were post-termination emails. I think what the district court was talking about there was that those emails occurred after the decision was made to include Mr. Anderson in the reduction in force. The decision had not been communicated to Mr. Anderson, but it's clear from those emails that the decision had been made. The question then is why? Mr. Todd suggests it's because Mr. Anderson required an accommodation. What makes it clear when the decision was made? Hopkins said in the email, an employee in Kansas City who has a six-month driving restriction has been identified for termination of employment. So that decision has been made before the email is sent to ask whether that's going to be an issue. Is there anything that pegs a date when the actual decision was made? There's nothing in the record that pegs a date when the decision was made. The witnesses testified, I think, fairly with Mr. Todd, that it was sometime between the seizure and the December 6th emails that were sent regarding the decision that had been made. But I think the emails reflect that the decision had been made. Agree, it had not been communicated. It was not communicated until December 17th, but the decision had been made. But you'll agree that the decision was made post-seizure and post-accommodation? Yes, I do agree. Post-seizure and post-accommodation. But I think it's important to talk about that accommodation for a second. They're suggesting that there is an animus because he required an accommodation. They provided an accommodation that he was not even entitled to. Employers are not required to reassign essential functions as part of an accommodation. Driving was certainly an essential function. They took an employee out of his job to drive Mr. Anderson around. There's no evidence. That's contrary to animus. He's getting an accommodation that is not required under the law. It goes above and below. They did not withdraw it. Mr. Anderson, the record is, said he devised his own accommodation which he was going to have his father-in-law drive him. But ADESA rejected that because his father-in-law was not an employee. That makes sense. He would have been covered by workers' compensation or other insurance. You can't have a non-employee driving an employee around on their route. So then the question is, why was Mr. Anderson included in the RIF? Can I follow up on that question? So then the next step would be, so he was continued to be driven around by another employee? The record is that Mr. Miller continued to drive him until the termination of his employment. The accommodation that was provided in the initial lasted the additional couple of weeks that his employment included. The question is why he was included in the reduction in force. It's uncontroverted in the record that he was in Market 7, that Market 7 had one too many employees, and admitted by the plaintiffs in the summary judgment briefing, the decision was made based on job description, skill set, performance and needs, and admitted that Mr. Anderson's performance goals, he was behind his peers. That's the legitimate non-discriminatory reason, and there's no evidence of pretext. There's no evidence that there was animus toward him. There was no discussion in the briefing by the plaintiff that in fact Mr. Anderson was not behind his peers in his performance goals, or that he was better qualified than the people who were selected. It's unfortunate when you have a reduction in force, that you have seven employees in six spots, and someone's going to talk like in law firms, right? We have six associates. They're all highly credentialed. They're all performing well. If our law firm tells us you only have the business for five, somebody's position is going to be eliminated. Unfortunately here, that position was Mr. Anderson's, but it didn't have anything to do with his seizure. It didn't have anything to do with his accommodation. It had to do with the admitted performance relative to his peers that was admitted by the plaintiff. With those admissions, there is not a reasonable inference that his seizure or his accommodation played a role in it, because they've admitted what the criteria were, and they admitted that he was behind his peers. What about the evidence that his, I'll just say superiors, I'm not sure I have the chain of command quite accurate, but we're very pleased with his performance, or at least expressed to him, we hope you stay on after the reduction in force, and we like what you're doing. You're a great hunter. I think the evidence in the record, and that was before the trial court, was they didn't know at the time how many positions or whether there would be eliminations. There were some markets where there were not position eliminations, but it's uncontroverted. This was market seven. There were six spots and seven people, so somebody was going to be included. I don't think anybody is saying in this record that Mr. Anderson was a poor performer. He was not otherwise at risk. None of the people in market seven were otherwise at risk. He wasn't, for example, on a performance improvement plan or being disciplined for his performance. He admitted in the joint appendix, I think it's 392, 393, he admitted that what the criteria were that were used for making selections and that he was behind his peers on his performance goals for the year in question. With those admissions, there's no reasonable inference that his seizure or his accommodation played a role in the decision making, especially in light of the generosity, for lack of a better word, of providing an accommodation to him after his seizure that the law doesn't take an employee out of work to drive Mr. Anderson around part time. Fundamentally disagree that the trial court misconstrued the timeline. I think the trial court was there, was referring to a decision that had been made before those emails were sent. If you look at the emails, it's clear that the decision had been made and what the explanation of the decision was. It's the same explanation that they gave to Mr. Anderson on December 17th when they terminated his employment. The trial court properly granted summary judgment and we think this court should affirm. Thank you. Very well. Thank you, Mr. Hanslick. Thank you, your honors. I'll just respond to a couple of points. First, on the point that Mr. Hanslick made, that this was an accommodation that the defendant was not required by law to do. It certainly may have been the case if they had gone through a full interactive process, that this would have turned out to be an unreasonable accommodation. We don't know that. What we do know is that while they did accommodate Mr. Anderson by having another employee drive him around for those few weeks between his seizure and the termination of the joint appendix, they had told him that that accommodation was not going to work going forward. That was the reason that Mr. Anderson proposed an alternative because he was concerned that due to this accommodation, that he was potentially going to lose his job. So he proposed the alternative of having his father-in-law drive him around and at that point, he never received a response to that request during his employment, essentially. So I think while it is true that they had not stopped the accommodation formally before the termination, they had certainly signaled an intent that this accommodation that we're giving you is not going to work going forward and they stopped engaging with him on what might work going forward. Second, I would note that while the defendant has portrayed this as part of a bigger reduction in force, and we certainly don't dispute that other people were let go around this time, it seems that within Mr. Anderson's group, it was a much smaller decision than that. This was a decision of out of, I believe, six or seven salespeople, they were going to let one person go. There's no evidence at the time if this was a bigger reduction in force showing a spreadsheet or something of saying, look, these are our 300 salesmen from across the country. These are all of their performance numbers from 2017, 2018, 2019. These are the bottom 30 folks and they're going to be out. There's nothing along those lines in the record. Instead, we have a decision that seems to have been made by Lindsey Comer and by Kathy Hopkins about one person in the plaintiff's sales group and that decision seems to have happened essentially right at the time of his seizure and his request for an accommodation. But do you agree that he was the lowest performer in that group? We do agree that as far as his 2019 performance results, I think that's the case, although we have not seen the kind of hard concrete numbers in the record that I think you would expect from this type of situation. I think that the defendant has said that that was not the only factor in its decision. It was also factoring in, and I see I'm running out of time to answer, they were also factoring in the organizational fit for positions in the new reformed company and that was where it really seemed like the good conversations Mr. Anderson was having with his supervisors were that he had really improved the sales territory that had previously been doing very poorly and they looked forward to him continuing to do that in the future until he needed an accommodation. I have one other question for you. You heard Mr. Hanslick's response to your argument that the court misconstrued the timing of the December 6 emails. Do you have a response to that? I do. I think that the defendant here is really leaning heavily on the word identified in Ms. Hopkins' first email that's on the joint appendix, page 345. I think that to say that the decision had been made prior to those emails, I think that that's a word that's open to interpretation. It's a word that, you know, through testimony at trial and ultimately through a jury inference, I think they could decide that, look, she was considering terminating his employment at that point, but she wanted to talk it over with HR, she wanted to talk it over with Ms. Comer, she was still making the decision at that point. So I would just stand on that. So you don't have any evidence, any record site that identifies a specific date when the decision was made? I do not, Your Honor, and I think at this stage of the case, the inference to draw from that in favor of the nonmoving party is that the decision had not been made. And if there are no further questions, I will finish up. Thank you, Your Honor. Thank you. Thank you, counsel, for your appearance today and argument. The case is submitted and we'll issue an opinion in due course.